IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 1, 2020

## STATE OF TENNESSEE v. ARLENE T. PUGH aka ARLENE MCFADDEN

**Appeal from the Circuit Court for Madison County**
**No. 19-987    Kyle C. Atkins, Judge**

_____

### No. W2020-00084-CCA-R3-CD

_____

A Madison County jury convicted the Defendant, Arlene T. Pugh aka Arlene McFadden, of disorderly conduct, assault, and resisting arrest, and the trial court imposed an eleven-month, twenty-nine day probation sentence, with a seven-day jail sentence.  On appeal, the Defendant asserts that the evidence is insufficient to support her convictions because of conflicting testimony of the witnesses.  Because credibility determinations regarding witness testimony are within the province of the jury, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

William J. Milam, Jackson, Tennessee, for the appellant, Arlene T. Pugh.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Nina W. Seiler, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from an incident involving the Defendant's presence at her daughter's middle school on February 4, 2019.  Before the Defendant arrived at the school that day, a resource officer stopped a fight between two female students in the bathroom at North Parkway Middle School in Madison County, Tennessee.  One of the

students was the Defendant's minor daughter, ("KJ") [1].  These charges arise out of the Defendant's interaction with school officials after learning of the student fight.  For her role in these events, a Madison County grand jury indicted the Defendant for disorderly conduct, assault, and resisting arrest.  A jury trial on the charges was held September 24, 2019.

At the Defendant's trial, the parties presented the following evidence:  Larry Ivery, II, the North Parkway Middle School assistant principal, learned of the fight between the two students from resource officer, Deputy Daniel Jones.  Dr. Ivery met with the students and had them "write their statements."  Based upon these statements, Dr. Ivery understood that two students, one of which was the Defendant's daughter KJ, agreed to fight in the bathroom.  After these two students "finished," KJ fought a second student. A fourth student was paid ten dollars "to close the door" while students were in the hallway between class periods.  Dr. Ivery determined that he would suspend the three students involved in the fighting.  He separated all three students and instructed them to remain in the office while he attended to other school business.  He later learned that, during this time, two of the students left the office and called their parents.

While Dr. Ivery was away from the office area, an office staff member notified him that "a parent was on the way."  Dr. Ivery returned to his office and shortly thereafter "one group of parents" arrived, and the Defendant arrived "later on."  The Defendant joined Dr. Ivery, the parents of the student engaged in the first fight, and their daughter in Dr. Ivery's office.  Dr. Ivery attempted to show the Defendant "the statement," but the Defendant did not want to see it and demanded to know why Dr. Ivery had not called her. She then, with a raised voice and the use of profanity, addressed the other student.  Dr. Ivery's office door was open and students in the office area also could hear the Defendant.  Dr. Ivery told the Defendant "we're not doing that."  When the Defendant continued, Dr. Ivery asked her to leave.  When he realized she was not going to leave or discontinue using profanity, he contacted Deputy Jones over the school radio and asked him to "remove" the Defendant.

Shortly thereafter, Deputy Jones arrived and asked the Defendant to leave.  The Defendant began arguing with Deputy Jones, saying "she wasn't going anywhere."  After several requests for the Defendant to leave, Deputy Jones physically removed the Defendant from the office while the Defendant "holler[ed]," "screamed," and grabbed on to the "door seal."  Based upon the Defendant's conduct, the school principal instructed Dr. Ivery to call the Jackson Police Department.  After completing this phone call, Dr. Ivery walked out to the "lobby" and found the Defendant handcuffed, on the floor, and cursing.  Due to the Defendant's behavior, the school was placed on lock down for the

---

[1] It is the policy of this court to reference minors by their initials for purposes of privacy.

remainder of the day so that the students did not transition through the hallways between class periods.

At one point after her arrest, Dr. Ivery was concerned that the Defendant was "having a seizure" so an ambulance was called. He stated that this caused the Defendant to be "irate" and that "there was some hollering." After examination, the EMS workers released the Defendant to the police, and the Jackson police officers placed her in a police vehicle.

Tiffany Smith Taylor, North Parkway Middle School principal, overheard Dr. Ivery on the school radio requesting assistance from the school resource officer in respect to an "irate parent." After hearing the call for Deputy Jones, Ms. Taylor went to Dr. Ivery's office where she observed the Defendant, the Defendant's older daughter, Zyaire Lewis, and Nissan Mitchell, a family friend, who were all yelling. Dr. Ivery told Ms. Taylor that he had asked the Defendant to leave because she was using profanity and she refused. Ms. Taylor observed the Defendant using profanity with a raised voice while students were in the area. Dr. Ivery and Ms. Taylor both repeatedly asked the Defendant to leave, and the Defendant refused to comply. The Defendant told Ms. Taylor that she was not leaving and "can't nobody make her leave."

After the disturbance moved into the "hallway," Ms. Taylor watched as Deputy Jones addressed the Defendant, and the Defendant's older daughter, Ms. Lewis, stepped in between Deputy Jones and the Defendant, entering the argument with Deputy Jones. Ms. Lewis told the deputy that he could not make them leave and then shoved Deputy Jones. The deputy and school administrators continued to ask the Defendant and Ms. Lewis to leave the premises. The women, however, continued to yell "obscenities" at Deputy Jones and Ms. Taylor.

The noise level and commotion in the hallway drew the attention of several school staff and faculty members who came to the area in response. The Defendant and Ms. Lewis eventually began moving down the hallway to the "lobby area." During this time, Ms. Lewis threatened Ms. Taylor, saying "I'll drag you across the floor." Ms. Lewis moved toward Ms. Taylor and a school employee stepped in between the two women. Ms. Taylor interpreted this action as the school employee attempting to shield Ms. Taylor from Ms. Lewis. Ms. Taylor felt fearful and believed Ms. Lewis was going "to try to swing or fight." A faculty or staff member ultimately persuaded Ms. Lewis to leave the building; however, the Defendant remained in the building "cursing out Deputy Jones, calling him names, insults, saying she's not leaving." At one point, the Defendant positioned herself like she was going to physically fight Deputy Jones. Ms. Taylor believed the situation had escalated too far and determined that the Jackson Police Department needed to be notified.

- 3 -

Ms. Taylor recalled the Defendant pulling at Deputy Jones's shirt and clothing while he was trying to place handcuffs on her. Deputy Jones attempted to use mace with no effect. The Defendant then pushed an eight foot by six foot chalkboard on wheels into the deputy causing him to lose balance. Deputy Jones took out his Taser gun, and the Defendant "was still reaching around, trying to grab things off of [Deputy Jones]." Ms. Taylor feared that the Defendant was going to gain control of the deputy's gun.

Concerned for student safety, Ms. Taylor instructed staff members present to ensure students did not leave their classrooms. Deputy Jones successfully deployed the Taser gun against the Defendant, and she fell to the floor but continued "swinging and moving." Nissan Mitchell, who was with the Defendant and Ms. Lewis, recorded a portion of the incident on a cellular phone. Ms. Taylor noted that Ms. Mitchell was the first of the three women to leave the building when asked. A video of this recording was played for the jury, and Ms. Taylor identified the various participants shown in the recording.

On cross-examination, Ms. Taylor testified that at no time did anyone block the doorway to prevent the Defendant from leaving. Ms. Taylor recalled a prior incident when the Defendant had reported that her daughter was being bullied. After investigation, it was determined that KJ was an active participant in the incident and both KJ and the other student were suspended. KJ had recently returned to school from that suspension when the bathroom fight related to these charges occurred.

Deputy Daniel Jones was walking the hallways during the change of classes on February 4, 2019. He noticed that the girls' bathroom door, which was normally kept open, was closed. Upon further inspection he saw two female students fighting, so he entered the bathroom and separated the students. Deputy Jones escorted the two students down to Dr. Ivery's office.

Deputy Jones left the office area but later returned at Dr. Ivery's request. When he entered the office area, he heard Dr. Ivery asking the Defendant to leave. In response, the Defendant was "yelling and cussing," refusing to leave. Deputy Jones addressed the Defendant telling her that she needed to stop yelling and cursing and leave the building. KJ and at least four other students were in the office area at the time. The Defendant refused to comply, told the deputy he could not make her leave, and threatened him. Deputy Jones attempted to usher the Defendant out of Dr. Ivery's office, but the Defendant grabbed the doorway. Deputy Jones did not recall if he made physical contact with the Defendant during this interaction, but he described "consolidating the space" so that the Defendant had no "choice but to" exit. Deputy Jones recalled that he gave the Defendant "every opportunity to leave without [ ] having to initiate an arrest." He

explained that, initially, he did not intend to arrest her for disorderly conduct; he only wanted her to exit the building in order to deescalate the situation.

Once out in the hallway, Deputy Jones pointed to the doors and told the Defendant to leave. When she refused, Deputy Jones initiated an arrest. The Defendant repeatedly pulled away from Deputy Jones as he tried to handcuff her. When he was finally able to hold her right wrist, Ms. Lewis stepped between the Defendant and the deputy and pushed Deputy Jones in his shoulder area. Deputy Jones grew concerned about safety when Ms. Lewis intervened in the arrest. Consequently, Deputy Jones pushed Ms. Lewis away attempting to create distance between Ms. Lewis and the Defendant so that he could complete the arrest; however, the Defendant became "extremely combative." The Defendant grabbed the deputy's uniform and radio and pulled down, causing Deputy Jones to fall to his knees. During this interaction, the Defendant ripped the Deputy's shirt and his radio and name badge were torn off and flew across the floor.

After Deputy Jones returned to standing, he employed chemical spray to effectuate the arrest. The mace, however, had no effect on the Defendant. She continued to be combative, to yell, and to curse. Because the chemical spray was ineffective, Deputy Jones employed his Taser gun. When he displayed the Taser gun, the Defendant pushed a rolling bulletin board at him. Deputy Jones moved the bulletin board out of the way, and the Defendant continued swinging at Deputy Jones's arms to knock the Taser gun away from her.

Deputy Jones made contact with the Taser gun, and the Defendant sat on the floor. The Defendant complied with Deputy Jones's order to roll on to her stomach and place her hands behind her back. Deputy Jones then handcuffed the Defendant. Deputy Jones confirmed that he was fearful at times during this incident.

The Defendant's adult daughter, Ms. Lewis testified for the defense. Ms. Lewis received a phone call from KJ at around 1:50 p.m. on February 4, 2019. KJ told Ms. Lewis she needed a ride home from school because she had been suspended. Ms. Lewis and the Defendant drove to the school and met with the assistant principal. Ms. Lewis denied "being ugly" to anyone at the school but admitted that KJ was "kind of, but not really" "running her mouth." Ms. Lewis denied any interaction with Deputy Jones other than "when he tried to arrest [the Defendant] the first time, when he pushed us all out [of] the way." According to Ms. Lewis, Deputy Jones attempted to arrest the Defendant in Dr. Ivery's office. She explained that she and her mother were walking out of the office but a group of teachers were blocking the office doorway. As she and her mother stood there talking, Deputy Jones pushed passed the teachers who were blocking the doorway to arrest the Defendant. Ms. Lewis denied assaulting or cursing at Deputy Jones.

In the lobby area, Ms. Lewis told her mother to "calm down," and Deputy Jones instructed them to "move back." Shortly after that, she left the building and went outside. Ms. Lewis called the police because "[t]hey" were being "outrageous" and "taking the situation too far." Ms. Lewis explained that Nissan Mitchell was with them at the school because the three women had been together in the car when Ms. Lewis received the phone call from KJ. Her only intention in going to the school was to pick up KJ, but she was instructed KJ was in Dr. Ivery's office. Ms. Lewis did not hear Dr. Ivery ask the Defendant to leave. She related that when they arrived in his office, he began explaining why he had not called the Defendant about the incident. The Defendant interrupted him and asked to speak to the principal.

Ms. Lewis testified that Dr. Ivery was lying when he testified that he asked the Defendant to leave his office because the Defendant was raising her voice and cursing. Ms. Lewis recalled that the Defendant was trying to speak with the parents of the other student because the parents indicated that they wanted to resolve the situation. Ms. Lewis said that they were trying to leave but could not due to people blocking the office doorway. Ms. Lewis denied ever approaching Ms. Taylor. She explained that Ms. Taylor was behind her, pushing her out of the door, and Ms. Lewis turned around. Ms. Lewis denied that the video portrayed her approaching Ms. Taylor. She said the only statement she made to Ms. Taylor was that "they were unprofessional." Ms. Lewis denied cursing but admitted that she can be heard saying, "M-F" on the video recording. Ms. Lewis denied ever pushing Deputy Jones, explaining that she approached only to tell the Defendant to "calm down." Ms. Lewis agreed that the school administrators did not prevent her from leaving.

The Defendant testified that she had four or five "problems" with the school in relation to KJ before the incident related to her arrest. The Defendant felt like KJ was bullied at school and brought this to the attention of the school administrators. When "nothing happened," she "went to the school board several times." On October 29, 2018, the Defendant went to the school to get KJ's phone, and Deputy Jones told the Defendant she was trespassing. The Defendant then spoke with Ms. Taylor, unaware that Ms. Taylor was the principal, and Ms. Taylor "swung her hair in [the Defendant's] face" causing the Defendant to "cuss" Ms. Taylor out. Ms. Taylor told the Defendant she was not going to get the phone, the Defendant had to leave the premises, and the Defendant was trespassing. Following which, Deputy Jones attempted to arrest her.

About the incident leading to her arrest, she explained that she went to the school office where a school secretary told her "they" were meeting in Dr. Ivery's office and escorted the Defendant to the office. Ms. Lewis and Ms. Mitchell were with the Defendant when she entered Dr. Ivery's office. In the office was Dr. Ivery, KJ, the other

student engaged in the fight, and the other student's grandmother and uncle.[2]  She recounted the events in the office as follows:

> I walked in.  I said [ ], "I brought you the video last week and then this is her first day back from a suspension and she's back in the bathroom fighting again.  What y'all going to do about it?"
>
> He said, "I haven't even had a chance to get around to it."
>
> I said, "This is some bull sh**t.  I'm going over your head."  The only cuss word I used at that moment.
>
> I turned around and I started talking to the grandmother of the little girl.
>
> He never told me to leave.  The thing I knew, Officer [Jones] came in there . . . and grabbed me.  My back was to him.  I didn't know what was going on.  He grabbed me.  He said, "You're trespassing."
>
> And I snatched away from him and I was like, "How am I trespassing?  They call[ed] me over here."

The Defendant continued, recalling that she grabbed a small chair to create distance between herself and the deputy.  The deputy told her that she needed to leave, and she responded, "okay."

The Defendant told KJ to come with her and positioned herself behind "[her] kids" so as to exit the office last.  Ms. Taylor, Mr. Sears, two other people the Defendant could not recall, and the deputy were all gathered in the doorway preventing their exit.  Deputy Jones threatened that if the Defendant "said another word" she would go to jail.  Ms. Taylor then asked the Defendant what was going on, and, in turn, the Defendant asked the deputy if she could respond.  Deputy Jones responded by pushing her out of the office door, so she began walking.  When she reached the main hallway, Deputy Jones began pushing the Defendant and grabbing for her arm, and she pulled away from him.  She stated that she was trying to leave, but the deputy "kept grabbing me."  When she saw Deputy Jones "reach for something," she grabbed a "rolling board" and pulled it in front of her to protect herself from a potential shooting.

---

[2]  Dr. Ivery refers to the adults in his office as the student's parents.  Although the Defendant stated it was the student's grandmother and uncle, based upon the context within the transcript, we understand these adults to be the same individuals regardless of their familial relationship to the student.

The Defendant said that she was calm until Deputy Jones touched her in Dr. Ivery's office. The Defendant said that Deputy Jones pushed "everybody" and "spray[ed] the whole room with mace." The Defendant's only concern was getting out of the school alive and safe, so she did not observe everything going on during the course of these events. The Defendant testified that had Deputy Jones not pushed her, she would "have calmly walked out of there without any further incident."

The Defendant testified on cross-examination that she went to the school solely to pick up KJ. When she arrived, she was told Dr. Ivery wanted to speak with her, and she was escorted to his office. She explained that Ms. Lewis and Ms. Mitchell were with her because they were all in one car and they "[b]asically" followed her into the school. The Defendant admitted to using profanity in Dr. Ivery's office in front of students but explained "they cuss more than me."

The Defendant denied being combative or touching Deputy Jones in any way. The Defendant agreed that she was aware that Deputy Jones was trying to arrest her but denied seeing handcuffs. When asked, she stated that she did not comply with Deputy Jones when he informed her of her arrest because she did not agree with his "decision." The Defendant recalled that she had difficulty breathing due to the mace and sought help from the EMTs. The EMTs, however, would not help her because Deputy Jones was "standing out there." The Defendant then clarified that she did not want medical help because she was embarrassed and that Deputy Jones had "drug [her] around . . . like a rag doll." The Defendant insisted that she was doing what she had been asked to do, pick up KJ from school.

After hearing this testimony, the jury convicted the Defendant of disorderly conduct, assault, and resisting arrest. The trial court sentenced the Defendant to serve eleven months and twenty-nine days, suspended, except for service of seven days. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant argues that the evidence is insufficient to sustain her convictions for disorderly conduct, assault, and resisting arrest based upon contradictory testimony. She asserts that Dr. Ivery's testimony contradicted Deputy Jones's testimony and that her testimony contradicted the testimony of both Dr. Ivery and Deputy Jones. The State responds that the evidence is sufficient to support the jury's verdicts for disorderly conduct, assault, and resisting arrest. We agree with the State.

- 8 -

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)).  This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence.  *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant claims that contradictions between witnesses' testimonies undermine the convictions.  We disagree.  It is within the province of the jury to make credibility determinations with regard to witness testimony.  *Bland,* 958 S.W.2d at 659.  This court will not reweigh the evidence or substitute its inferences for those drawn by the trier of fact.  *Dorantes*, 331 S.W.3d at 379.  We now turn to consider the sufficiency of the evidence for each conviction.

### A. Disorderly Conduct

The Defendant contends that the evidence is insufficient to sustain her conviction for disorderly conduct.  Tennessee Code Annotated section 39-17-305(b) (2018) defines the offense for which the Defendant was charged as making "unreasonable noise that prevented others from carrying on lawful activities."

The evidence, viewed in the light most favorable to the State, showed that the Defendant used profanity in a raised voice to address a student in Dr. Ivery's office.  Dr. Ivery testified that there were other students in the area who could also hear the Defendant.  Dr. Ivery told the Defendant she could not confront the student in that manner, and the Defendant continued.  Dr. Ivery asked the Defendant to leave, and she refused.  Ms. Taylor and Deputy Jones also testified to the Defendant yelling and cursing in an area where students were present.  The Defendant was repeatedly asked to leave the building to end the commotion and disruption to the school, but she refused.  The confrontation moved to the lobby area where the disturbance continued, requiring administrators to place the school on lockdown for the remainder of the day to prevent students witnessing the Defendant's behavior.  Administrators also testified to seeking assistance from the Jackson Police Department and the involvement of other faculty and staff members who were drawn to the area due to the "holler[ing] and scream[ing]."

We conclude that this is sufficient evidence upon which a rational jury could find, beyond a reasonable doubt, that the Defendant made unreasonable noise that prevented the school from carrying on its normal, daily activities.  She is not entitled to relief.

**B. Assault**

The Defendant also contends that the evidence is insufficient to sustain her conviction for assault. Tennessee Code Annotated section 39-13-101(a)(2) (2018) provides that an assault is committed when a person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." The evidence, viewed in the light most favorable to the State, showed that there was a physical altercation between Deputy Jones and the Defendant as the deputy attempted to remove the Defendant from the school. The Defendant was repeatedly asked to leave the school premises based upon her behavior, and she refused. Because the Defendant failed to leave the school, Deputy Jones attempted to arrest the Defendant and the physical altercation continued. Ms. Taylor testified that the Defendant was grabbing at the deputy in a manner that caused concern that the Defendant could gain control of the deputy's gun. Based upon her concern over this altercation, Ms. Taylor instructed faculty to keep students in the classrooms for safety reasons. The Defendant shoved an eight foot by six foot rolling bulletin board into the deputy and physically grabbed him. After she grabbed his shirt she forcefully pulled down, causing the deputy to fall on his knees and ripping his radio and name tag off of his shirt. Deputy Jones testified that he felt fear at times during this encounter.

We conclude that this is sufficient evidence upon which a rational jury could have found, beyond a reasonable doubt, that the Defendant did intentionally or knowingly cause Deputy Jones to reasonably fear imminent bodily injury due to the Defendant's combative behavior and exertion of physical force against him during the execution of the arrest. The Defendant is not entitled to relief.

**C. Resisting Arrest**

The Defendant also claims the evidence is insufficient to sustain her conviction for resisting arrest. The Tennessee Code defines the crime of resisting arrest as occurring when "a person . . . intentionally prevent[s] or obstruct[s] anyone known to the person to be a law enforcement officer . . . from effecting a stop, frisk, halt, arrest, or search of any person, including the defendant, by using force against the law enforcement officer or another." T.C.A. § 39-16-602(a) (2018).

In this case, the Defendant refused to leave the school when repeatedly asked by Dr. Ivery, Ms. Taylor, and Deputy Jones. Instead she continued to curse, yell, and argue that no one could make her leave. When it was clear that the Defendant would not leave the school grounds to deescalate the confrontation, Deputy Jones attempted to arrest the Defendant. The Defendant testified that she was made aware of Deputy Jones's intent to

arrest her.   The Defendant resisted Deputy Jones's attempt to handcuff her by pulling her hands away, pushing a rolling bulletin board at him, and physically grabbing Deputy Jones's shirt and pulling him downward.

Based upon this evidence, a rational jury could find the Defendant guilty beyond a reasonable doubt of resisting arrest; as such, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing, we conclude that the evidence is sufficient to support the Defendant's convictions.  Therefore, the trial court's judgments are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE